All right, this case is 25-3138, Vote America v. Schwab. Mr. Schlossman for the appellant. Good morning, Judge Timkovich, and may it please the court, and I would respectfully request two minutes for rebuttal. This court in Vote America 1 held that while the plaintiff's mailings of pre-filled, unsolicited, advanced mail ballot applications implicate pre-speech, the burden imposed by Kansas's prohibition on that conduct is, quote, small and minor, and does not impede parties from choosing whatever avenue of communications they want for advocating mail voting. As a result, it is subject to only intermediate scrutiny, absent evidence of an improper purpose or justification. On remand, the district court, after invoking strict scrutiny with no sound legal basis, then proceeded to apply a version of intermediate scrutiny that entirely ignored the electoral context and effectively demanded strict scrutiny-level proof. This was error which must be reviewed de novo by this court under the Bowes and Cressman line of precedent, and we respectfully submit requires this court's reversal. Wait a minute. Sure. I take it your position is even though this circuit said this is not an election statute, it's a statute dealing with speech. Correct. I'm still relying upon the power and incentive of the government to regulate elections. Well, Your Honor, we're not suggesting that this is a election mechanic. This court held to the contrary in the first appeal. What are you claiming about relying upon elections? Because you mentioned that. Yes, right. And our point is that this is a First Amendment case, but in analyzing the narrow tailoring inquiry, the electoral context cannot be ignored. I mean, the fact is that when you're dealing with, for example, evidentiary proof burdens, when you're looking at what is entailed in the narrow tailoring inquiry, for example, there is a long line of precedent that the appellate courts have said, Supreme Court has said, that the electoral context is relevant to that in terms of what sort of burden the state has to marshal evidence, what sort of demands it has to articulate its interest, what proof threshold it has. So we're not retreating. We're not running from the fact that we're not suggesting, hey, this is an electoral mechanic and going back to Anderson, Burdick, or balancing this. So what's important is what is in the legislative record as to its desire to control, according to you, their desire to control elections. Well, we're saying that given the electoral context of this, that the burden on the state in terms of- But it's based on the legislative record. Well, I mean, the legislature has no burden to show its work, if you will. I mean, they're- They got to show, they got to talk about the purpose of the statute, don't they? Well, sure, but I mean- What did they say in the legislative history about the purpose of the statute? The statute, the legislative history, which is common in Kansas, just like many other places, there's not a lot that was said in the legislative history. They talked about the issues that had come up with the expansive number, the confusion that had come about as a result of the huge number of duplicate ballots that had occurred with people complaining. The issue of the motivation being reducing voter confusion, promoting efficient election administration, and public confidence. This is post-legislation and litigation gloss on what was intended by this statute. Well, that's correct, Your Honor, but I mean, the Supreme Court has held that in these First Amendment cases, you can look at the record that has been developed in the litigation, and you're not strictly limited to specific legislative findings. And that's especially true in the intermediate scrutiny context. I mean, sometimes there have been cases in the strict scrutiny context where they've said that you can't come up with a post hoc rationalization for something that the legislature did. But that's a far cry from what we have here. I mean, the fact- Our focus here is on the pre-filled applications. Correct. What was it, what evidence is there that the pre-filled applications promoted or undermined public confidence in election integrity? Well, Your Honor, we had extensive testimony from, and affidavit testimony from the county election officials in the state capitol in Shawnee County and Ford County, who talked about a huge number of voters who were calling in complaining that the advanced ballot applications that had been pre-filled that they were receiving in the mail were erroneous, that they felt like that they had to, in turn, that they were angry just at the fact that how could you get this information wrong. They were concerned about this might have suggested nefarious actors were at play. They were concerned that at that point that they said, well, gee, even though we've already sent in our ballot application, now we feel like we have to send in- Was that evidence before the legislature passed the bill, or was that during the litigation? That occurred during the litigation. I mean, there was no testimony to, for example, the committee on that issue who was addressing it. I was looking at Exhibit Z, which is a letter from the Deputy Assistant Secretary of State to the House election committee. I think it's dated February 18, 2021. Was that before the- Yes, yes. Well, that was obviously before- That was before the passage of the- That's exactly right. And so she did talk about all of the confusion. Was there anything else? I mean, that does talk about confusion. Was there anything else that was submitted to the legislature? Was there a hearing? Was there a hearing before the committee? There was a hearing before the House Elections Committee. They discussed the issue, but we don't have any specific testimony that said, from a particular voter, for example, on that issue, which is, frankly, quite common in legislatures, and in the Kansas legislature in particular. I mean, the history of making strong legislative records, I mean, there's obviously no constitutional requirement. As I said, show your work. But I think that that is, it's perfect. They were certainly well within their right, especially in an intermediate scrutiny type of analysis. And your other evidence, the county clerk evidence from the different places, it was speaking to a time that occurred before the passage of the bill. Correct, yes. Okay, so just making clear what the temporal nature of that was. That's absolutely correct, yes. I mean, all of this, the conduct that was really at issue was happening in the general election in 2020, and the bill was passed in the spring of 2021, so. I also looked at the stipulated facts. How were the stipulated facts prepared? The parties exchanged each exchange proposed facts. They were then, went back and forth. The parties agreed to. And that's primarily the basis for the district court. That's exactly right. There was no hearings in this case. There were no evidentiary hearings. There was no in-person, in-court hearings. There was no credibility determinations that the district court made. Everything was submitted on a stipulated fact. So it's all a completely written record. And so at times in the district court opinion, she'll use the terms credibility, and I think that's odd, and with respect, unwarranted, because there were no credibility determinations to make. This was all strictly a written record. But on that, the findings of the district court as to historical fact are still important, and so important that we apply the clear air standard, right? Well, that's true on historical facts, but your honor. Okay, I'm sorry. I got the floor here. Okay, I have probably this. The district judge found that the problems of voter confusion and election administration and public confidence were very generally caused by the nature of the time during COVID and the mailing of multiple applications, and very little or de minimis involved the pre-filled portion. Now, aren't those findings of historical facts? Judge, I think that what the district court was getting into were the why facts, the constitutional facts, and or both. I think that those are- Well, why was it a constitutional fact that she says this is the predominant reasons for the confusion? This is the predominant reason for the efficiency issues. This is the predominant reason for the public confidence issues. How is that a constitutional fact? That's a historical fact. Well, your honor, it is a stipulated fact. I mean, there is no dispute in the record that individuals who were receiving the duplicate applications felt that they had to return them no matter how many times that they had occurred. But I want you to talk to me about whether or not those findings by the district court were findings of historical facts and therefore require the application of the clear error standard. I guess, number one, I would say if we are into that arena, we think it's clearly clear error. But I also think that when you're looking at the why did Kansas act and you are, even if you accept the fact that when she said, well, we're looking at these, that I think many of the reasoning motivating Kansas was due to the duplicates. I mean, I think that's ultimately what the district court was finding. As she says, I think that you were ultimately focused on the duplicates and less so on the erroneous pre-filling. And of course, we argue that they went hand in hand, but again, I mean, I would suggest that that. But you're not answering my question. Wasn't her findings, aren't they findings of historical fact? Is it just, so it's a simple question. Well, and I'm not trying to fight you on this. I mean, I guess I would say that if it was simply what happened and her analysis was just looking at facts, I mean, that presumably is a historical fact. And what had happened is historical fact. No, Your Honor, I would respectfully submit that under the Boe's analysis, and if you look at the precedent, that when they talk about why something happened, that is considered a constitutional fact. I mean, that's the case law that we've cited in our brief. And I would just respectfully urge you to read those cases. What was the basis for the improper purpose finding? I didn't see any of that in the stipulated facts. Well, that's because there was that, did that come out of the party's briefing or? There was no evidence, no affirmative evidence whatsoever of any affirmative improper purpose or justification. The court, district court made that up sua sponte. There was nothing in the text of the statute, which, you know, like cases like Boe, there was nothing in the legislative record, nothing to support that. So the district court then, on her own, said, well, gee, I'm gonna come use judicial notice and I'm gonna take notice of certain comments made by President Trump on January 6th, 2021, or 2021, then she said, well, I'm also gonna take notice of lawsuits around the country that had absolutely nothing to do with our case and we're going to, because those cases tangentially involve perhaps mail voting and that they somehow, our legislature must have taken notice of those cases and therefore they acted with an improper purpose. I mean, there was absolutely no basis for that finding whatsoever. That's probably the easiest thing the court can do today is to strike that part. So the strict scrutiny analysis, which by the way, most of her findings were ultimately grounded in the strict scrutiny analysis. I mean, she then later did do, kind of examined, she said, well, I'm gonna examine the same thing under the intermediate scrutiny, but sort of the damage had been done in the strict scrutiny analysis. So turning to, yeah, well, turning to intermediate scrutiny, just very briefly, I would just say that when they talk about the absence of evidence to show the state's interests, I would point you to pages four to seven of our opening brief. I mean, we talk about the significant damage that, and then confusion and the, you know, 8% of the ballots had been admitted erroneous, submitted, included erroneous prefilling and we would respectfully submit that that was more than sufficient to justify the state's interests and to validate this particular prohibition. Thank you. Thank you, counsel. Oh, thank you, I'm sorry.  Good morning, your honors. May it please the court. My name is Alice Hewling, I'm counsel for appellee. Before turning to some of the items that were just discussed, I wanna focus on the threshold question that this court identified in its prior decision in this case, and that is whether or not appellants have sufficiently demonstrated that the personalized application prohibition is significantly, is narrowly tailored to a significant government interest. That is the question that this court ultimately asked or tasked the district court with considering. The district court did so and it found that appellants had failed to carry their burden. It came to that finding based largely on the fact that it did not see the requisite close fit between a real harm, a specific harm that was caused by the mailing of personalized applications, and that is the speech that's actually prohibited under the law at question here. No, Voting America 1 suggested that intermediate scrutiny was the right standard in this context and the district court went on to find an improper purpose and apply strict scrutiny. I just asked your colleague where that came from and was that all the creation of the district court or were there some other basis, evidentiary basis for that material? I think there were a few evidentiary bases for that. Firstly, to the extent that it was said that there was nothing in the stipulated facts with regard to some of the public statements and things like that. There is actually stipulated fact 106 identifies that there was an ongoing national debate including statements from public figures. It didn't articulate specific statements but it did note that those were happening with regard to the propriety and safety of voting by mail. I was kind of wondering what the improper purpose was. Was it to suppress mail-in voting or was it to target Vote America organizations like it? I mean, all these things have purpose, multiple purposes usually for legislatures but what was improper here? I think there are a few things that the court looked at and that appellees have spoken about previously in briefing and I think the court did an appropriate improper purpose analysis analogizing to what was done in the Eichmann case looking both at the asserted government interests which this court properly previously found were not, did not appear in the legislative record and also looking at the function of the law and how the law actually functions. And so like Eichmann looking at the text of the law, it applies specifically to those who solicit by mail and other to submit an absentee ballot application and it functionally applies to those. Was it targeted at the speaker or the content of the speech? It was targeted at the speaker. So a person who was sending what this court previously identified as speech which is mailing a personalized application. That is what's foreboding under the law. That's what the law targets. But what it targeted was the prefilled application. Basically all the bill does as I read it is you can't put the voter's name and address, right? Those two pieces of information can't be prefilled. It indicates that if you are doing sort of this sort of voter encouragement type of work, you cannot include a prefilled or personalized application. And I can admit that for those of us who are not in the business of doing direct mailings, that may seem frankly somewhat inconsequential. But I think it's telling to look at the fact that those who do this work and have done this work election after election, that that is their chosen means of conveying their message to make it as personalized as possible. And it's not just that that's true for folks who do direct mailers in the election context. I assume they wouldn't do it if they didn't think it helped their response rate. I believe that's correct, Your Honor. And that's based off of research. But on the other hand, there's really no suppression. There's no content suppression here because as I understand Vote America 1 on the record, your client could insert a document with the blank application that has all the information that the voter needs to fill it out. I'm not sure that that's quite right, Your Honor, because to get to that consideration of the fact that there's an alternative thing and I'll come back to whether that's a sufficiently ample alternative as it needs to be under McCraw. In order to get to that under the intermediate scrutiny analysis that this court previously identified as being appropriate here, the requisite narrow tailoring has to be demonstrated. And that hasn't been shown here. There just isn't evidence tying the pre-filling or personalizing of an application which this court identified as First Amendment protected speech to any of the purported harms that the appellants are now claiming. Before we get too far down this, I want to wrap up the improper purpose idea and the strict scrutiny idea. Did you press that at the district court on remand? We did put forward arguments in support of the improper purpose and that strict scrutiny was correct for the reason of the improper purpose. But we also put forward that the law cannot withstand intermediate scrutiny. And I understand that as being really the threshold question here. And just to be on the improper purpose idea, and I mean, we have to presume good faith on, I mean, our starting point is that we presume the legislature acted in good faith. And appellee wouldn't disagree with that, Your Honor. I think what the court did here was, and similar to what the court did in Eichmann, look at these stated reasons for the law and then look how the law functions. And here, the law functions to suppress particular speech, encouraging those to vote by mail. And, excuse me, in the legislative history for that, there is an indication that the secretary's office specifically and vociferously wanted to discourage engagement with those sorts of third party encouragements and sendings of applications. But another thing we do is the text is our primary source of intent. Would you agree with that? I think that that is a starting point. And where in Eichmann, the text sort of indicates a particular purpose, Eichmann points that certain words use that kind of get at the desecration of a flag. Here too, the text itself says those who are soliciting another to submit an absentee ballot application. So I think even starting with this text is a important first step in understanding a finding of an impermissible purpose here.  But I understand your thrust of your position in the district court was on intermediate scrutiny. And that, I'm sorry, Your Honor. Yes, that's correct, Your Honor. And that's not a Pelley backing away from the impermissible purpose or strict scrutiny arguments in our papers, but just for this court as a threshold, if it can't survive under intermediate, that's what's important. And here that showing has simply not been made. There is a disconnect between any sort of specific harm being articulated and any sort of showing that this restriction on personalizing absentee ballot applications would actually materially and definitely address that harm. And it's important that it meets that showing under intermediate scrutiny because that's what guarantees that the First Amendment speech at issue isn't something that a government can restrict based off of purely speculation or conjecture. And that's true whether that's First Amendment speech that seems very weighty and worthwhile to the government or not. It looks like you have to make a showing for intermediate scrutiny. There has to be a substantial government interest. And then it really has to have a substantial burden on speech. And just focusing, I see the burden, I think that Speech America One recognized that. Articulate for me why this legislation is a substantial burden on your clients. I'll put sort of four or two points. One is I respectfully disagree that it needs to be necessarily a substantial burden. There needs to be the showing that the government interest is not only significant in the abstract but real and connected to the burden at issue here. But where it is a finding of First Amendment speech and that First Amendment speech is cut off, which this court found that it was under this law, that is enough to trigger intermediate scrutiny. It's not a balancing type of inquiry from there based on this court's prior holding. You think my premise is wrong that there has to be a showing of substantiality? I would disagree. Okay, what case would best represent that? Excuse me. I was looking at Brewer to require some type of substantiality. Yeah, I hear that, Your Honor. That's not my reading of Brewer to say that it needs to be substantial. And I think there are other cases, and I apologize, the case name is escaping me, but where a slogan on a t-shirt or various things that might be seen as uncouth to some are nevertheless First Amendment speech that has protections even if it seems de minimis. Well, no one would disagree with that. We're just trying to make sure that the tailoring here is requisite to the claims, the benefits of the regulation. Well, and I'd like to speak to that, Your Honor. Appellants have made an argument that because this is in an electoral context that somehow lessens the showing that needs to be made under intermediate scrutiny or there's sort of introduces a balancing that needs to happen. And they do not point to a case that would make that true in this case. I think the case they most rely on is Burson. And there it makes very clear that that is specific to speech that interferes with the act of voting. There's no argument here that this is that type of speech. And that case and others specify that if that is not what's at play, which is not at play here, then that heightened specific factual showing that is generally required under intermediate scrutiny is still what must be shown. And I do want to also pause and go back to sort of the second part of your prior question, which had to do with the sort of substantial burden. And again, kind of go back to the point that this is the type of speech that folks who do this type of work do. And that is for a reason. It's a portion of their speech. It's not the speech in toto filling in these blanks. There's more that goes with it. There is additional speech that goes with it. That is true. And this is a small part of a much larger message that comes in these mailers. But I think it is telling that folks who do sort of this sort of direct mailing encouragement, even outside of the voting context, time and again go to this specific way of making that encouragement. I think of credit card solicitations that I've gotten where my information is already filled in. I think of a AAA solicitation I got where they actually sent me a card with my name printed on it. They do so because it conveys a message and it has a meaning, as opposed to doing something along the lines of what you had suggested as an example of kind of including the information separately. There may be reasons they don't do it that way. Wouldn't want to introduce the possibility of information getting mistranscribed as it gets put into the application. And I think the record also makes clear that the prefilling can actually have net benefits. There are multiple counties that prefilled themselves and did so to help provide assistance to the voter. I like your hypotheticals, but I think I've got one of those AAA cards too. What if I thought it was real and I took it and called AAA and they wouldn't come? Wouldn't that be a situation where a state could enact some consumer protection legislation that would somehow, in some way, regulate those type of mailers for the benefit of the consumer to prevent confusion or concerns? And I think that is where we end up back at the intermediate scrutiny requirements that this court has identified as being necessary here, which is if that kind of a showing could be made by the state that there were issues of that type that you just put forward, that might be a different story. But this record does not contain that evidence making that close fit such that a prohibition of a First Amendment type of speech is necessary to prevent specific harms that have been identified. You know, and we kind of started with the stipulated facts, and they do, I mean, there's 200 of them, and they do recount some evidence of confusion, 10,000 or so duplicate ballots. One of the mailers had the ballots being sent back, not to the clerk's office, but to Vote America's Illinois offices, and things like that were stipulated, too, and I don't think they're really controversial, but that kind of evidence goes to the clerk efficiency voter confusion piece. I think to the extent that there is some stipulation as to testimony in the evidence, that is an important distinction between the testimony and the underlying facts on the ground, and whether that any sort of confusion is specific to prefilling, as opposed to the general confusion of voters in an unprecedented election, many of whom were contemplating voting by mail for the first time, who needed, or there was some assumption that they needed additional voter education on this process they were attempting to avail themselves of. County election officials took action to try and educate voters during that time, as did civic engagement organizations like Apelli, and they may have sent out multiple waves that time. I think it is also noteworthy in the evidence. In 2018 and 2022, Apelli sent out a single wave of prefilled personalized applications, and Appellant does not point to any evidence that would seem to tie any sort of voter confusion to prefilling in any of those instances. One of the stipulated facts, I think it was for probably 2020, there were, I think, five waves of mailings, and if I understood the stipulated fact, the last two waves that were closest to the election did not include the prefilled advanced application because it was creating confusion. Let me just provide a bit more context for that. It was not the last two, it was the third and fourth, for what it's worth, but that was because Apelli, in that particular case, realized a small, admittedly small, as stipulated, two percentage of their applications nationwide had some suffixes or middle initials that were erroneously added in, and so stopped prefilling until that could be ensured to not be happening, and started prefilling again, and have done so since. Could Kansas react to that evidence legislatively in a permissible way? I mean, it has to meet intermediate scrutiny, but it could be the basis for legislative action. I don't think Apelli would disagree that it could be the basis for legislative action, but that there is not evidence in the record here that it was, because again, to the extent that there are affidavits asserting beliefs that voters were confused and things of that nature, they don't distinguish between the waves that were prefilled and the waves that were not prefilled. So again, it's not tied back to the actual restriction here, which is the ability of the folks sending these through the mail to include the voter's name and address. How specific does the legislature have to be? I mean, consider my home state that has no legislative history. I mean, we can, like in a state like that, you can never know. I don't, that's an interesting point, Your Honor. I think crucially here for the intermediate scrutiny analysis, it doesn't all hinge on how specific the legislative history is. For example, the record makes clear that multiple election officials testified that they found the prefilled election applications to be identifiable, and yet there is no demonstration tying or quantifying that to any of the erroneously or incomplete or duplicative applications that were submitted, but that's something that could have been done, presumably, and that wouldn't necessarily have to have been, to meet the burden in defending the law under intermediate scrutiny, wouldn't necessarily have to be part of the legislative. Okay, so you're not advancing the idea that the legislature has to come up with these very specific findings and that they have some wiggle room in enacting legislation and in identifying what they believe are problems that need to be responded to. That is certainly true. When the legislation that they have come up with is a restriction of First Amendment speech, as it is here, that doesn't negate their obligations under the requisite First Amendment requirements of demonstration of tailoring of a real and specific harm that it, and a showing that that harm is specifically addressed by the restriction, and that there was not consideration of other less speech-restrictive alternatives that was also considered. That is also a part of the intermediate scrutiny test that this court identified, and that is not a part of the record here. Okay, how would that ever work if it were a state that didn't keep records of proceedings? From the legislative record? I think there could be a demonstration of, as I sit here sort of thinking this hypothetical through with you, I think there could be a examination of records kept at the county level office or here at the secretary's office that might not have been part of a formalized legislative history record, but would still indicate that these were considerations and issues that were being recorded and dealt with in the moment. Okay, no, I appreciate that, and there's probably not a good answer for me to just spring this on you today, but I just, you know, we want to respect, we want to be able to review something, but we also have a duty to, when the judiciary gets involved, we try to respect what legislatures are doing too, so it's a balance. And if I may, and I understand that, and I know I'm past time, I did just want to make one clarification to something that my colleague mentioned. There was, this was a trial on the papers, as was discussed, but there was a relatively robust evidentiary hearing at the PI stage, which involved, I believe, four of the six fact witnesses that testimony was proffered from within the stipulated record. There was some evidence that the pre-filled did cause some confusion, did cause some administrative headaches, but it wasn't, as I read the district court's decision, it was saying that predominantly these problems that are in the justifications for the legislation were not generally placed at the foot of the pre-filed, pre-filled part, but instead at the multiplicity of mailings and the setting of the 2020 election during COVID. Was that the thrust? Yes, you have little tidbits there, but predominantly this was the cause of the confusion, et cetera. Yes, Your Honor, and I think that specifically on that point, Mr. Howell, the Shawnee election official, when asked if pre-filling increased confusion, answered he did not think that that was the primary concern, and much of what is pointed to by appellants as record evidence in affidavits or attestations speaks to inaccurate and or duplicate and uses language something like that, which sort of mushes any sort of confusion together, apologize for the inartful word, and doesn't specifically identify the harm that would be responded to by this legislation, and it is that kind of specificity that case law under intermediate scrutiny says is required here. Thank you. Thank you, Counsel. Good thing you were last of the day. Because you went over, I'll give Mr. Schlossman three minutes, if you want. Thank you, Your Honor. Let me address some of the points that were raised here. The first is on the burden. I think much of that was addressed in the Vote America one, and I won't repeat it up here. I would just strongly urge you to read pages 845 to 851 of the opinion, and they talk at length in so many ways about how the burden on the plaintiffs here is very de minimis, so I'll just leave it to the court for that. In terms of the narrow tailoring, I mean, I believe that the district court and the plaintiffs are trying to hold the state to far too high of an evidentiary burden. I mean, this court recognized that plaintiff's conduct involves protected expression. But the context, which is the pre-filling of a government form that is part of the voting process, has to inform the burden and the tailoring analysis. I mean, it shows how minimal the impact of this regulation is, and why the evidentiary burden is far more relaxed than the district court held. And I would simply point out, too, in the Burson case, I mean, I believe the district court has made an erroneous interpretation. I talk about this in the brief, but in terms of what is the context in which the court held, the Supreme Court held, that there is a relaxed evidentiary burden. I mean, it is, they cite to Monroe, which dealt with the ballot access provision, which is even further removed from the advanced ballot application process. The advanced ballot application is a component of the voting process. So the case that they cited in distinguishing for other contexts, they cited to Mills, which involved a prohibition on any conduct involving same-day advocacy. So you couldn't even print an editorial in the newspaper. I mean, that is obviously a blatant First Amendment violation. Same context would come up in McIntyre v. Ohio, where there was a prohibition on anonymous campaign literature. Of course there would not be a relaxed burden on evidence in those kind of cases. But this is, although it implicates speech, and we're not running from that, it's got to be included in terms of the electoral context and articulating. Wasn't the Burson relaxed approach, it was when you were talking about the mechanics of voting itself, was it not, and that's not this case. Well, Your Honor, the court has held that this is not a strictly mechanical ballot. I acknowledge a mechanical electoral context. This doesn't have anything to do with the act of voting itself. It's the application process. I would respectfully disagree. The application itself is part of the, it's formula. I mean, you can't get a ballot without submitting the application. The application is. And forget the ballot and walk in and not mail it in and just walk in and vote. And it's controlling that, how you are able to cast your vote at the ballot box. But Your Honor, this case is about the application. The whole issue here is the regulation on the application. If you're just walking in to vote, then you're not submitting an application. Is this application the act of voting itself? It is part of the, I would submit that it is part of the act of voting, that it's part of the voting process. So I would suggest that this is. You can expand it, but it's not the act of voting. Well, I think it is part of the act of voting. I mean, we can kind of get into a theological debate, I mean, about the semantical debate about what that means, but I think it's broader than that. I also just point to you the Supreme Court's case, TBS versus FCC, 1997, 520 U.S. at 224. And they were talking about their, that you can't sort of, when any time the First Amendment is invoked, that you can't evade some of the other deference that comes with the state. There they said that judgments about how competing economic interests are to be reconciled in the fast changing pace of television are for Congress. These judgments can't be ignored or undervalued simply because plaintiffs cast their claims under the umbrella of the First Amendment. So I would just say that this is, they're trying to apply. Go ahead and wrap up. Yeah, thank you. They're trying to apply the same standard here in a government election form as they are to a traditional public forum like a public median or sidewalk. And I would say that those are incompatible. And the final, I would just say that the cases they talked about, Brewer, McCrawl from this court, each of them were dealing with the traditional public forum. And if you read those cases, each of them talked about the burden on the plaintiff's speech rights being severe. So with that, I thank you very much for your time, Your Honor. Thank you, counsel. Appreciate your arguments, your excuse, and the cases submitted.